## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. _____

POPSOCKETS LLC,

               Plaintiff,

v.

Y.E.F TRADING INC, ELI FRIEDMAN,
and JOHN DOES 1-10, individually
or as corporate/business entities,

               Defendants.

---

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND OTHER RELIEF
FOR VIOLATIONS OF 15 U.S.C. § 1114; 15 U.S.C. § 1125; C.R.S. § 6-1-105;
TORTIOUS INTERFERENCE; AND RELATED CLAIMS; AND JURY DEMAND**

---

Plaintiff PopSockets LLC ("PopSockets") brings this action against Defendants Y.E.F Trading Inc ("YEF Trading"), Eli Friedman ("Friedman"), and John Does 1-10 (collectively, "Defendants") for (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) false advertising in violation of 15 U.S.C. § 1125(a)(1)(B); (4) common law trademark infringement; (5) common law unfair competition; (6) deceptive trade practices in violation of C.R.S. § 6-1-105; and (7) tortious interference with contract and business relations. These claims arise from Defendants' infringement of PopSockets' trademarks in connection with Defendants' unlawful and unauthorized advertisement and sale of POPSOCKETS-brand products on the Internet. In support of its complaint, PopSockets alleges as follows:

1

## PARTIES

1.     PopSockets is a limited liability company, organized under the laws of the State of Colorado, with its principal place of business located in Boulder, Colorado.

2.     YEF Trading is a corporation, organized under the laws of New York, with its principal place of business located at 1537 59th Street, #2R, Brooklyn, NY 11219.   Upon information and belief, YEF Trading operates or assists in the operation of a storefront on www.amazon.com ("Amazon") that is currently called "The Savings Center."  This storefront can be accessed at:  https://www.amazon.com/sp?seller=A39V60W8ZT39LG.   YEF Trading does business throughout the United States through the Amazon storefront "The Savings Center."

3.     Friedman is a natural person who, upon information at belief, resides at 1537 59th Street, #2R, Brooklyn, NY 11219.  Upon information and belief, Friedman operates or assists in the operation of "The Savings Center" on Amazon.  Friedman does business throughout the United States through the Amazon storefront "The Savings Center."

4.     Upon information and belief, Friedman is in control of, a principal of, and primarily responsible for YEF Trading and its actions. Friedman signed the certificate of incorporation of YEF Trading on or around April 2016.

5.     PopSockets asserts claims against Friedman in both his individual capacity as well as his capacity as a corporate officer of YEF Trading.

6.     Until it conducts discovery, PopSockets cannot conclusively determine whether Friedman in his individual capacity, YEF Trading, or both operate the Amazon storefront "The Savings Center."

7.     Alternatively, upon information and belief, Friedman directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing the POPSOCKETS trademark by YEF Trading.  In communications with PopSockets, Friedman has admitted that he assists in the operation of "The Savings Center."  Accordingly, Friedman is personally liable for infringing activities of YEF Trading without regard to piercing the corporate veil.

8.     Alternatively, on information and belief, YEF Trading follows so few corporate formalities and is so dominated by Friedman that it is merely an alter ego of Friedman. Accordingly, PopSockets is entitled to pierce the corporate veil of YEF Trading and hold Friedman personally liable for the infringing activities of YEF Trading.

9.     PopSockets believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to PopSockets.  Therefore, PopSockets sues these Defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, PopSockets will seek leave to amend this Complaint accordingly.  If PopSockets does not identify any such parties, it will dismiss these Defendants from this action.

## JURISDICTION

10.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  PopSockets' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), and its claims arising under the laws of the State of

Colorado are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Colorado and established sufficient minimum contacts with Colorado by, among other things, advertising and selling infringing products bearing the POPSOCKETS trademark to consumers within Colorado through one or more highly interactive commercial websites, through the regular course of business, with the knowledge that PopSockets is located in Colorado and is harmed in Colorado as a result of Defendants' sales of infringing products to Colorado residents.  Defendants know that PopSockets is located in Colorado, among other reasons, because they received a cease-and-desist letter that identified PopSockets as a limited liability company located in Colorado and notified Defendants that their unlawful actions are harming PopSockets in Colorado.  PopSockets' claims arise out of Defendants' sales of infringing products bearing the POPSOCKETS trademark to Colorado residents through the regular course of business.

## VENUE

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### PopSockets and its Trademarks

13.     PopSockets develops, manufactures, markets, and sells grips/stands, mounts, and other mobile device accessories under the POPSOCKETS brand (collectively, "PopSockets products").

14.     PopSockets sells its products in the United States exclusively through its own website and through a network of Authorized Distributors, Authorized Retailers (who purchase products directly from PopSockets and sell products either at their brick-and-mortar locations or through their proprietary websites authorized by PopSockets, as detailed herein), and Authorized Resellers (who purchase products from distributors and sell either through approved websites or at their brick-and-mortar locations, as described herein) (collectively "Authorized Sellers"). PopSockets devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.  By distributing products exclusively through its website and through Authorized Sellers, PopSockets is able to ensure the satisfaction of its consumers and maintain the integrity and reputation of the POPSOCKETS brand.  In the highly competitive mobile accessories market, quality and customer support are fundamental parts of the customer's decision to purchase a product.

15.     To promote and protect the POPSOCKETS brand, PopSockets has registered numerous trademarks with the United States Patent and Trademark Office (the "PopSockets Trademarks"), including, but not limited to, the following:

POPSOCKETS            U.S. Trademark Reg. No. 5,486,563

            U.S. Trademark Reg. No. 5,204,637

            U.S. Trademark Reg. No. 4,575,440

# PopSockets

U.S. Trademark Reg. No. 4,572,125

16.     The registration for each of the PopSockets Trademarks is valid, subsisting, and in full force and effect.

17.     PopSockets actively uses and markets all of the PopSockets Trademarks in commerce throughout the United States.

18.     Because of the quality, reliability, and durability of PopSockets products, consumers recognize the PopSockets Trademarks as being associated with high-quality grip, mount, and case products in the mobile accessories industry.

19.     Consumers associate the POPSOCKETS name with the quality and innovation of PopSockets' products.  Since its inception, PopSockets has been committed to taking all possible measures to guarantee high-quality, innovative, and lasting products.

20.     For these reasons, the PopSockets Trademarks are widely recognized by the general consuming public of the United States and PopSockets is recognized as the source of products bearing the PopSockets Trademarks.

21.     Due to the superior quality and exclusive distribution of PopSockets products, as well as PopSockets' recognition as the source of high-quality products, the PopSockets Trademarks have substantial value.

### Online Marketplaces and the Challenges they Present to
### PopSockets Product Quality

22.     E-commerce retail sales have exploded over the past decade.  From 2007 to the beginning of 2018, the percentage of total retail sales in the United States that were completed

through e-commerce channels rose from 3.2% to 9.4%.  *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS, March 13, 2019, https://fred .stlouisfed.org/ series/ECOMPCTSA.

23.     In 2018, consumers spent $517.36 billion on e-commerce sales, a 15% increase from 2017.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2018, United States consumers spent $206.82 billion in e-commerce sales on Amazon, a 16% increase from 2017.  *See* Fareeha Ali, *U.S. ecommerce sales grow 15.0% in 2018*, DIGITAL COMMERCE 360 (March 13, 2019), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

24.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

25.     For example, consumers who purchase products through the online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different product if the one they initially select is damaged or has been tampered with.  Instead, consumers must trust that the product they choose over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

26.     The online marketplaces also allow a third party to sell products anonymously, i.e., without disclosing their actual identity or sources to consumers.  As such, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on the online marketplaces without having to reveal his or her identity to the consuming public.  This effectively prevents the manufacturer and the consumer from being able to reach sellers, like Defendants, and address quality concerns.

27.     It is common for these unauthorized sellers to sell diverted products of lesser quality or to mix fake products in with shipments to unwitting consumers.  Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust these marketplaces and think that the products they are buying through these marketplaces are genuine.  Spencer Soper, *Amazon Gets Real About Fakes*, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

28.     In its 2018 annual report to its shareholders, in fact, Amazon admitted that third-party sellers on its marketplace may be selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm.  Amazon acknowledged that these actions are "violating the proprietary rights of others."

29.     Because these diverters operate anonymously, a brand owner has no ability to exercise its quality controls over the products they sell or to ensure that the products are safe and authentic.

30.     The reality of online marketplaces also poses threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

31.     When purchasing products on a marketplace, consumers cannot easily distinguish between a brand owner's authorized and unauthorized sellers.  Indeed, on some marketplaces, like Amazon, all sellers are listed under one product listing.  As a result, many customers purchase products without knowing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls or is selling products that do not qualify for the manufacturer's warranty.

32.     When a customer purchases a product on a marketplace and receives a damaged, defective, expired, soon-to-expire, or poor-quality product, the customer is much more likely to associate that frustration with the brand than with the anonymous seller.

33.     The online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances: product reviews.  Any consumer who is dissatisfied with a product he or she receives can post a review on the marketplace for all other consumers to see.  Most often, these reviews, which are often permanently fixed, will criticize the brand, not the seller.

34.     These product reviews have a significant impact on a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews when buying a new product online and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

35.     Consumers place extraordinary trust in these online reviews, as they are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners. *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.        Because

consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

36.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's online product listings. According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product. *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

37.     Negative reviews may also hurt a brand's product placement in search results, further reducing the likelihood that customers will purchase the products.

**Sales of Poor Quality PopSockets Products on Online Marketplaces Have Caused Consumers to Write Numerous Negative Reviews of PopSockets and PopSockets Products**

38.     Consumers who purchase from anonymous, unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on product listings. These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

39.     PopSockets has been the subject of numerous negative online marketplace reviews from customers who purchased PopSockets products of poor quality. These customers complain

of receiving damaged, defective, counterfeit, or otherwise low-quality products and give the PopSockets product a 1-star rating, reducing the product's average rating and reputation.

40.     On December 24, 2018, Amazon user "JenMonica7" reported that she received a fake PopSockets product when she purchased a product on Amazon. The fake PopSockets product looked identical to the real one from the product listing, but did not work and could potentially cause damage to consumers' phones.



41.     On December 16, 2018, Amazon user "Cheryl H." complained that she received a PopSockets product through Amazon that appeared to be previously used, had no protective film over the adhesive, and would not stick to her phone.



42.     On December 11, 2018, Amazon user "amber sylvia" complained that she received a PopSockets product that was a "waste of money" because it "came without the adhesive to attach it to anything."



43.     On December 10, 2018. Amazon user "Steven Tobias" complained that a PopSockets product he purchased on Amazon "[i]immediately broke when taking out of package."



44.     On December 9, 2018. Amazon user "Destiny" complained that two different PopSockets products she had purchased on Amazon were "constantly falling off my phone." She reported that her experience was "Terrible!" and that she was "[n]ot sure what is going on with Pop Socket."



45.     On December 2, 2018, Amazon user "Xility" complained that a PopSockets product she purchased on Amazon would not "stay on" her phone because its glue was "not sticky enough."

She added that "I have never had this problem with my other pop sockets and they have all outlasted the phones they are attached to."



46.     On November 17, 2018, Amazon user "Mario" complained that a PopSockets product he purchased on Amazon "came [broken] and felt like a really cheap material."  He explained that he "didn't even use it once."



47.     On November 14, 2018, Amazon user "MaryAnn" complained that a PopSockets product she received from Amazon "was already opened" and was "not even sticky."



48.     On November 9, 2018, Amazon user "joanne Tran" reported that "I bought this same popsockets years ago.  When I got the iPhone X last year and I was even able to remove it

off my old phone and put it on my new phone and it still worked just fine for another 10 months

before it finally broke.  I ordered a new one and [after] a few days it would not stay on.  I kept

putting it back on and again it would come off.  I thought maybe I got a defect so I ordered another.

Same thing happened!  The quality is no longer the same.  Don't waste your money on this and

order from another brand."



49.    On November 8, 2018, Amazon user "Valerie" reported that she received a

PopSockets product that was missing the plastic cover needed to protect the adhesive.



50.    On October 26, 2018, Amazon user "Jen Arnold" reported that a PopSockets

product she purchased on Amazon was "scratched/damaged" when she received it and came in a

"ripped package."



51. On October 12, 2018, Amazon user "John Alise" reported that he was very disappointed because a PopSockets product he purchased on Amazon was scratched when he received it.



52. On September 23, 2018, an Amazon Customer reported that the PopSockets product he purchased on Amazon "fell off in the first day," whereas the PopSockets product he had previously purchased from the PopSockets website had "lasted almost a year."



53. On August 9, 2018, Amazon user "K.S." reported that a PopSockets product she purchased on Amazon was counterfeit.



54.     On September 7, 2018, Amazon user "McDgirl4eva" complained that a PopSockets

product she purchased on Amazon "just does not stick to the phone case" and fell off moments

after she had first attached it "when I was simply holding the phone.  It was a waste of money."



55.     On August 27, 2018, Amazon user "ChenchaTristan" complained that, after

ordering two PopSockets products, he received only one product and received empty packaging

rather than a second product.



56.     On August 4, 2018, Amazon user "MFranny" reported that the PopSockets product

she purchased for her daughter "didn't seem as sticky as other [PopSockets] we've had," and was

completely useless three days later.



57.     On July 29, 2018, Amazon user "Aaliyah" complained that a PopSockets product she purchased on Amazon "[l]ooks nothing like the picture!"



58.     On July 15, 2018, an Amazon customer complained that the PopSockets product he purchased "came to me with black marks like it was dirty and scratches [like] it had been used."



59.     On July 11, 2018, Amazon user "Breck olsen" reported he was "[v]ery disappointed" because the PopSockets product he purchased "came open and already used!"



17

60.     On July 9, 2018, Amazon user "Jen" complained that the PopSockets product she ordered arrived in dirty condition, looked used, and would not stick.



61.     Also on July 9, 2018, Amazon user "Carlos F. Garcia" reported that the PopSockets product he ordered from Amazon "came broken" even though a PopSockets product purchased at the store "worked flawlessly."



62.     Also on July 9, 2018, Amazon user "monica" reported that her PopSockets product was useless because the glue had melted before she received the product.

It's pretty but much smaller than expected/the other Pop Sockets I've had and completely useless. I think the glue melted in transit and the plastic backing wouldn't come off. When I finally peeled it, it's not really sticking to my phone!

63.     On July 4, 2018, Amazon user "ryan" reported that, a day after he affixed to his phone a PopSockets product he purchased on Amazon, the product "fell off ONTO MY SEVEN WEEK OLD BABY'S HEAD."



64.     On July 3, 2018, Amazon user "Ibmongo" complained that the PopSockets product the user ordered was "garbage" because it had "arrived slightly warped so it doesn't keep a good seal flat and just peels off."  The user warned other Amazon customers, "[d]on't buy."



65.     On June 27, 2018, Amazon user "Steffani Murphy" reported that the PopSockets product she purchased on Amazon "didn't stick" but that the PopSockets product she ordered directly from the PopSockets website "has been doing just fine."



66.     On June 26, 2018, Amazon user "Marj" complained that the PopSockets product she ordered was "useless" because it "[c]ame with fuzz and other lint like substance on [the] sticky part."

67.     On June 21, 2018, Amazon user "Beth Gaedtke" complained that the PopSockets product she received was used and did not work because it did not contain the adhesive covering that PopSockets products are supposed to have.  She warned that she would never buy the product again.



68.     On June 19, 2018, Amazon user "MissDivaDana" complained that she received a PopSockets product that was "damaged," "[d]irty, scratched, and discolored."



69.     On August 15, 2017, Amazon user "Kaya smith" reported that she received a counterfeit PopSockets product when ordering on Amazon, which did not work and came in a different color from what she ordered.



70.     On July 7, 2017, Amazon user "Potato Head" left a one-star review on a PopSockets product listing after receiving a poor-quality PopSockets product and noted that the seller "offered no help" and provided "extremely poor customer service."



71.     On December 4, 2016, Amazon user "Felix" reported that the PopSockets product he received looked "[a]s if a dog had been chewing the backside before they shipped it to me" and left "a nasty residue the minute I applied it to my phone."



72.     The foregoing reviews are only a small sample of the negative reviews of PopSockets products that have been posted on the Amazon platform.

**PopSockets Has Implemented Quality Controls to Combat the Problems Presented by Online Marketplaces, Protect the Value of the PopSockets Trademarks, and Ensure Customers Receive the Genuine, High-Quality Products They Expect From PopSockets**

73.     The above reviews show that sales of poor-quality PopSockets products cause significant harm to PopSockets' reputation and goodwill and threaten the safety of consumers and their phones.   To protect itself and consumers from these harms, PopSockets has implemented a quality-control program that applies to all authorized brick-and-mortar retail sellers, online sellers, and PopSockets itself.   These controls protect the value and goodwill associated with the POPSOCKETS brand.

74.     The goal of this program is to ensure that consumers who buy PopSockets products receive products that feature all of the special characteristics that consumers have come to expect from products sold under the POPSOCKETS name, including the PopSockets warranty, quality, and reliability.

75.     The program seeks to minimize the likelihood that poor-quality products will reach consumers.  By preventing consumers from receiving poor-quality products, the program protects consumers from confusion, as well as protects the value and goodwill associated with the POPSOCKETS brand.

76.     PopSockets abides by its quality-control procedures.  Moreover, as discussed below, PopSockets requires its Authorized Sellers to abide by the quality-control requirements and has policies and procedures in place to audit its Authorized Sellers to ensure that they comply.

77.     PopSockets' ability to exercise its quality controls is essential to maintaining the integrity and quality of PopSockets products, as well as the value of the PopSockets Trademarks and other intellectual property.

### Authorized Sellers Must Adhere to PopSockets'
### Quality-Control and Customer-Service Requirements

78.     PopSockets maintains strict quality controls over PopSockets products by selling its products to consumers exclusively through its website and its network of Authorized Sellers.

79.     PopSockets permits Authorized Sellers to sell PopSockets products only in specific channels and requires Authorized Sellers to abide by applicable authorized seller policies and agreements relating to quality controls, customer service, and other sales practices (collectively, the "PopSockets Rules").

80.     The PopSockets Rules limit to whom and where Authorized Sellers may sell PopSockets products.  To prevent unauthorized persons from acquiring and reselling PopSockets products, the PopSockets Rules permit PopSockets products to be sold only by Authorized Sellers. PopSockets' Authorized Distributors are authorized to sell PopSockets products for purposes of resale only to Authorized Resellers that are approved by PopSockets.  PopSockets permits Authorized Resellers and Authorized Retailers to sell PopSockets products only to end-user consumers; they are specifically prohibited from selling products to anyone who intends to resell the products.

81.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling products on unauthorized websites, including but not limited to third-party marketplaces such as Amazon, without the consent of PopSockets.

82.     These restrictions are essential to PopSockets' ability to exercise its quality controls over PopSockets products because they allow PopSockets to know which of its Authorized Sellers are approved to sell online and where its Authorized Sellers are selling online.  If a quality issue arises through an online sale by an Authorized Seller, PopSockets can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue.  PopSockets is unable to take such action in connection with sales by unauthorized sellers because it does not know who these sellers are and cannot obtain their cooperation in addressing any product-quality issues that may arise.

83.     In addition to restricting where and how Authorized Sellers can sell PopSockets products, the PopSockets Rules also require Authorized Sellers to adhere to PopSockets' quality-control requirements related to the inspection, handling, and storage of PopSockets products.  This

23

requirement helps ensure that PopSockets products are stored properly and are not damaged prior to being sold to the consumer.

84.     To ensure that consumers receive the genuine, high-quality products that they expect from PopSockets, the PopSockets Rules require that Authorized Sellers inspect all products for damage, defect, and other non-conformance, and they prohibit Authorized Sellers from selling any damaged, defective, or non-conforming PopSockets products.  Further, to assist PopSockets in identifying any product-quality issues, Authorized Sellers are required to report any damage, defects, or non-conformances to PopSockets.  Negative reviews on Amazon show that consumers have received PopSockets products with visible problems such as dirt, warping, fuzz, and missing and damaged components. *See, e.g.*, *supra* ¶¶ 41-42, 46-47, 49-51, 55, 58-61, 64, 66-68, 71.  An Authorized Seller inspecting products as required would have caught those problems and prevented the product from being shipped to the consumer.

85.     To avoid consumer confusion and ensure that consumers receive genuine PopSockets products, the PopSockets Rules prohibit Authorized Sellers from relabeling, repackaging, or altering PopSockets products.  Authorized Sellers must not remove, translate, or modify the contents of any label or literature accompanying PopSockets products.  Further, Authorized Sellers are prohibited from tampering with, defacing, or otherwise altering any identifying information on PopSockets products, including serial numbers and UPC codes.  Negative reviews on Amazon show consumers have received PopSockets products in incorrect packaging. *See, e.g.*, *supra* ¶¶ 47, 50, 55, 59.  Such products would not have been shipped by Authorized Sellers that follow PopSockets' quality controls.

86.     PopSockets also ensures that consumers receive safe products by requiring that Authorized Sellers assist with recalls and other consumer-safety information efforts.

87.     The PopSockets Rules also require Authorized Sellers to provide certain services to their customers.  Authorized Sellers must familiarize themselves with the features of all PopSockets products kept in their inventory so that they can advise customers on the selection and safe use of PopSockets products and share any applicable warranty, guarantee, or return-policy information.

88.     Following the sale of genuine PopSockets products, Authorized Sellers must provide ongoing support to consumers and prompt replies to their inquiries.

89.     Authorized Sellers agree to permit PopSockets to review and monitor their activities to ensure their compliance with PopSockets' quality-control and customer-service requirements, including by permitting inspection of their facilities and records relating to PopSockets products.

90.     PopSockets' quality-control requirements are legitimate and substantial and have been implemented to facilitate PopSockets' control over the quality of goods manufactured and sold under the PopSockets Trademarks.  These controls enable PopSockets to protect consumers and the value and goodwill associated with the PopSockets Trademarks.

91.     PopSockets' quality-control requirements are material because they are designed to protect consumers and prevent them from receiving poor-quality products and poor customer service.

92.     Consumers find it material and relevant to their purchasing decisions to know whether a PopSockets product is being sold by an Authorized Seller subject to PopSockets'

quality-control requirements, or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, PopSockets' quality controls and over whom PopSockets cannot exercise quality controls.

**Given the Flood of Poor-Quality Products on Online Marketplaces and Consumers' Inability to Inspect Products Before Purchasing Them Online, PopSockets Imposes Additional Requirements on its Authorized Sellers Who Sell Online**

93.     Given the many unscrupulous sellers, like Defendants, anonymously selling products online, PopSockets imposes additional quality-control requirements with respect to online sales.

94.     The PopSockets Rules restrict the manner in which PopSockets products may be sold to end-user consumers online.  These rules allow PopSockets to oversee all Authorized Sellers who sell PopSockets products online.

95.     Except for a limited number of Authorized Sellers who are permitted to sell PopSockets products on Amazon, Authorized Sellers are permitted to sell PopSockets products online only on their own proprietary websites, provided that those websites satisfy certain criteria and comply with PopSockets' quality control standards for online sales ("Permissible Public Websites").

96.      To qualify as a Permissible Public Website, a website must be operated by the Authorized Seller in the Authorized Seller's legal name or registered fictitious name and must state the Authorized Seller's legal name or registered fictitious name, mailing address, telephone number, and email address.  Permissible Public Websites may not give the appearance that they are operated by PopSockets.  Permissible Public Websites do not include storefronts on online marketplace websites like Amazon.

97.     PopSockets' standards and criteria for Permissible Public Websites were established to ensure that the websites represent the POPSOCKETS brand properly and to prevent sellers from operating the websites in a manner that is inconsistent with or detrimental to the POPSOCKETS brand.  These standards were also designed to allow PopSockets to quickly address any product quality issues that may arise.

98.     The PopSockets Rules prohibit Authorized Sellers from selling anonymously online and instead require Permissible Public Websites to state the seller's legal name or registered fictitious name and current contact information.  This requirement allows consumers to understand the nature of the seller from whom they are purchasing and enables consumers to contact the seller if any quality issues arise.  This requirement also allows PopSockets to protect the public from the sale of poor-quality and counterfeit PopSockets products because it permits easy detection of any Authorized Seller who sells poor-quality or counterfeit goods.

99.     The PopSockets Rules also require that Permissible Public Websites comply with all applicable privacy, accessibility, and data security laws, regulations, and industry standards.

100.    Authorized Sellers must not, on any Permissible Public Website, represent or advertise any PopSockets product as "new" if the product has been returned with its original packaging opened or has otherwise been altered by the customer.  Typically, if a customer returns a product that was purchased through a third-party online-marketplace site, the online marketplace will repackage the product and allow it to be relisted as "new."  Indeed, customers purchasing PopSockets products on Amazon have complained of receiving products that appear to have been used.  *See, e.g.*, *supra* ¶¶ 41, 47, 50, 58-60, 68.

101.    Unless otherwise approved by PopSockets, Authorized Sellers selling on Permissible Public Websites may not use any third-party fulfilment service to store inventory or fulfill orders for PopSockets products.  This requirement ensures that PopSockets can quickly investigate and address any quality-control or customer-service issues related to order fulfillment.

102.    Additionally, Authorized Sellers selling on Permissible Public Websites must use images of PopSockets products provided or approved by PopSockets and must keep product descriptions and images up to date.  Online consumers who purchased from unauthorized sellers have complained of receiving PopSockets products that looked different from what was advertised. *See, e.g.*, *supra* ¶¶ 57, 69.

103.    Permissible Public Websites must have a mechanism for receiving customer feedback, and Authorized Sellers must take appropriate steps to address any feedback received.

104.    Authorized Sellers who sell online must also cooperate with PopSockets in investigating any negative online reviews related to their sales of PopSockets products.  Again, this is a critical component of PopSockets' quality-control program because it allows PopSockets to quickly address quality issues identified in online reviews with the responsible Authorized Sellers, which it is unable to do for products sold by unauthorized sellers like Defendants.

105.    In light of the unique quality-control challenges and heightened potential for consumer confusion presented by online marketplaces such as Amazon, PopSockets has approved only certain Authorized Sellers who can meet heightened quality-control standards to sell on the Amazon marketplace.

106.    Limiting the number of sellers authorized to sell PopSockets products on Amazon allows PopSockets to monitor the sellers and their customer feedback closely, address any product-quality issues promptly, and better protect the public from counterfeit products.

107.    Authorized Sellers approved to sell on Amazon are required to follow strict storage and handling guidelines.  Poor storage conditions have caused consumers to complain of problems such as melted glue, *see, e.g.*, *supra* ¶ 62, and are likely responsible for the unexplained product quality and durability problems that consumers have experienced when buying PopSockets on Amazon but not in brick-and-mortar channels.  *See, e.g.*, *supra* ¶¶ 43-45, 48, 52, 54, 56, 61, 63, 65.

108.    Pursuant to the PopSockets Rules, Authorized Sellers approved to sell on Amazon that are using Amazon's Fulfillment by Amazon service must require Amazon to not commingle their inventory of PopSockets products with any products belonging to any other seller.  By default, Amazon's policy is to commingle products from different third-party sellers using Amazon's Fulfillment by Amazon service, such that a consumer ordering from one seller could receive a product provided to Amazon by an entirely different seller. In that case, the consumer may receive a poor-quality product from a seller even if the seller itself follows quality controls prior to shipping the product to Amazon's fulfillment centers.  The consumer may also receive a counterfeit or fake product due to commingling.  Authorized Sellers approved to sell on Amazon must affirmatively opt out of commingling and may bear additional costs for doing so.  This requirement to prohibit commingling is crucial to ensuring that consumers who purchase products from Authorized Sellers on Amazon receive genuine PopSockets products that have been subject to PopSockets' quality controls.

109.    Importantly, Authorized Sellers approved to sell on Amazon are required to apply unique Fulfillment Network Stock Keeping Unit ("FNSKU") labels to each PopSockets product fulfilled using the Fulfillment by Amazon service.  This requirement prevents commingling by Amazon.

110.    Authorized Sellers approved to sell on Amazon that are using Amazon's Fulfillment by Amazon service must also affirmatively opt out of Amazon's "FBA Repackaging Service" service.  If such Amazon sellers do not opt out of Amazon's "FBA Repackaging Service," Amazon will allow products that were returned and previously opened by customers to be resold as "New" through Authorized Sellers' storefronts.

111.    The additional quality-control requirements that PopSockets imposes on its Authorized Sellers who sell on Permissible Public Websites and on Amazon are legitimate and substantial and have been implemented to allow PopSockets to control the quality of PopSockets products that are sold online and to quickly address any quality issues that arise.

112.    PopSockets' quality controls are material, as they have been implemented to ensure that consumers purchasing PopSockets products online receive genuine, high-quality PopSockets products that abide by PopSockets' quality controls.  Consumers purchasing PopSockets products online would find it relevant to their purchasing decisions to know whether the products they are buying are vended by an Authorized Seller who is subject to, and abides by, PopSockets' quality controls.

### PopSockets Audits its Authorized Sellers Who Sell Online to Ensure They Comply with its Quality-Control Requirements

113.    In order to ensure that Authorized Sellers who sell on Permissible Public Websites and on Amazon adhere to PopSockets' quality-control requirements, PopSockets regularly

monitors sales of its products online. Pursuant to this auditing program, PopSockets reviews Permissible Public Websites and authorized storefronts on Amazon to ensure compliance with the PopSockets Rules.

114. PopSockets also monitors online product and seller reviews and has policies in place to conduct test purchases and inspections to confirm Authorized Sellers' compliance with all quality-control and customer-service requirements.

115. Through these verification activities, PopSockets is able to communicate with its Authorized Sellers to understand the nature of any product-quality issues or negative reviews and to facilitate appropriate corrective actions.

116. PopSockets is also able to discipline Authorized Sellers that fail to comply with its quality-control requirements and, if needed, terminate an Authorized Seller's approval to sell online or to sell PopSockets products generally.

**Genuine PopSockets Products Come with a Warranty; Defendants' Products Do Not**

117. PopSockets products purchased from Authorized Sellers also come with a limited warranty that warrants against manufacturing defects in materials and workmanship under normal use for three years (the "Warranty"). If PopSockets determines that a product covered by the Warranty is defective, PopSockets provides at its option either (i) a product replacement, (ii) repair of the product, or (iii) a refund of the purchase price.

118. PopSockets extends the Warranty only to products that were sold by sellers that are subject to PopSockets' quality controls. Because products sold by unauthorized sellers are not subject to PopSockets' quality controls and PopSockets cannot ensure the quality of such products,

PopSockets does not extend the Warranty to products sold by unauthorized sellers, including Defendants.

119.    The Warranty states that "PopSockets Products are legitimately sold only by authorized retailers who are required to follow PopSockets' policies, procedures, and quality control standards."  The Warranty also states that "[a]n original or copy of the sales receipt from the original PopSockets authorized sales retailer is required for warranty service, unless otherwise prohibited by law."  *See Limited Warranty*, *available at* https://www. PopSockets.com/pages/warranty.

120.    The Warranty is a material component of genuine PopSockets products. Consumers who purchase PopSockets products with the Warranty receive the peace of mind that they are receiving a high-quality product, that PopSockets stands behind the product, and that if a defect occurs, they will have the ability to have the product repaired, replaced, or refunded.

121.    Consumers would find it material and relevant to their purchasing decision to know whether the PopSockets product they are buying is covered by the Warranty.  If a consumer knew that a PopSockets product did not come with the Warranty, the consumer would be less likely to purchase the product.

**Following the Implementation of PopSockets' Quality-Control Program, Unauthorized Sellers Outside of PopSockets' Quality Controls Have Continued to Sell Poor Quality Products and Caused Consumers to Write Negative Reviews of PopSockets and PopSockets Products**

122.    Following PopSockets' implementation of its quality-control program, customers who purchase on online marketplaces have continued to leave extremely negative reviews of PopSockets and PopSockets products.  Customers have continued to leave these reviews because many sellers on online marketplaces are unauthorized sellers of PopSockets products who are not

32

subject to and do not follow the quality controls that PopSockets requires its Authorized Sellers to follow.  Customers who purchase from these unauthorized sellers complain of receiving damaged, defective, counterfeit, or otherwise low-quality products and give PopSockets products a poor rating, reducing the products' average rating and hurting their placement in search results.  These reviews harm PopSockets' reputation and goodwill and cause it to lose sales.

123.    For example, on December 10, 2019. Amazon user "Camila Queiroz" complained that a PopSockets product she purchased on Amazon was "dirty" when she received it.  She added that "the adhesive had nasty dirty on it and was not sticky, the plastic that is supposed to come on the adhesive was halfway off and would not stick."   She concluded: "I will not order from here again and would recommend others do not."



124.    On December 9, 2019, Amazon user "Yoga Dog" complained that a PopSockets product he purchased on Amazon "[c]ame with NO sticker over the adhesive" and was "stuck on the inside of the package which I could hardly get off and by then it was ruined."



125.    On December 7, 2019, Amazon user "Chauntelle" complained that a PopSockets product she purchased on Amazon came without the "pop out" component that accompanies PopSockets products.  She warned other customers: "[Don't] waste your money."



126.    On December 3, 2019, Amazon user "Ava Schultz" complained that she purchased a PopSockets product on Amazon that arrived without the "pop grip" component.



127.    On November 30, 2019, Amazon user "Krystal" complained that a PopSockets product she purchased on Amazon "[l]ooks used and very dirty."



128.    On November 26, 2019, Amazon user "Blue glitter" complained that a PopSockets product she purchased on Amazon "arrived bent," which caused it to "not properly adhere to phone case and [fall] off."



129.    On November 24, 2019, Amazon user "Dana Cram" complained a PopSockets product she purchased on Amazon arrived with a damaged component that "has fallen off multiple times."



130.    On November 23, 2019, an Amazon customer complained that, after purchasing a

PopSockets product, she received a product that was "completely different" from what had been

pictured in the product listing.



131.    On November 20, 2019, Amazon user Bryan complained that he purchased a

"defective" PopSockets product that "won't lay flat when closed" or "open properly" and that

PopSockets would not replace the product because he had purchased it from an unauthorized seller.



132.    On November 18, 2019, Amazon user "B" complained that a PopSockets product

she purchased on Amazon "fell off two days after putting it on my phone."  She stated that she

was "[n]ot wasting any additional money on popsockets and buying a loopy case."



133.    On November 16, 2019, Amazon user "Jazmin Noriega" complained that a PopSockets product she purchased "came scratched" and then "the top part came off . . . [a]lmost two weeks later."



134.    On November 15, 2019, Amazon user "Ali M." complained that a PopSockets product she purchased on Amazon was "obviously fake."  She explained that she has "been using popsockets for a while on all of my devices" and the product she purchased "doesn't look or feel like any of the popsockets I've owned in the past."  She also noted that the product "doesn't look anything like the display image – it has a white back and the front looks like it's been colored black with a sharpie."  She urged other customers: "DO NOT BUY."



135.    On November 12, 2019, Amazon user "Britt" complained that a PopSockets product she purchased on Amazon "came broken and incomplete."  She explained that "[t]he second part of the popsocket was completely broken off and not in the envelope."



136.     On November 12, 2019, an Amazon customer reported that a product she received through amazon was "NOT a genuine pop socket . . . . [i]t was cheaply made, flimsy and broke almost immediately."



137.     On November 11, 2019, Amazon user "Layle Da Rosa" complained that a PopSockets product she purchased on Amazon was different from what had been pictured in the product description.  She lamented: "[n]ow I wasted my money because of inaccurate description."



138.     On November 8, 2019, Amazon user "Kimberlea" reported that she purchased a product on Amazon that did not come in authentic PopSockets packaging and was not an authentic PopSockets product.



139.    On November 8, 2019, Amazon user "C.R." complained that a PopSockets product she purchased on Amazon had "horrible adhesion" that "only lasted for 2 days before it keeps coming off." She added that she "had other PopSockets before and they lasted for about a year," and wanted other customers to "[s]pend your money elsewhere. Not worth it."



140.    On November 8, 2019, Amazon user "DeDe Kelly complained that a PopSockets product she purchased on Amazon "keeps coming off my phone and actually made me drop my phone and shatter the screen."



141.    On October 25, 2019, Amazon user "RDC914" complained that a PopSockets product he purchased on Amazon "[b]roke within a minute of regular use."



142.    On October 23, 2019, Amazon user "Angela Armstrong" complained that a PopSockets product she purchased on Amazon was previously used and had a different design from the product she had ordered.



143.    On October 20, 2019, Amazon user "Laker" complained that a PopSockets products he purchased on Amazon was "scratched up" when it arrived.



144.    On October 11, 2019, Amazon user "Harley" complained that a PopSockets she purchased on Amazon arrived damaged, with "[o]ne side of the image . . . completely rubbed off when I took it out of the package."



145.    On   October   5,   2019,   Amazon   user   "Mariposa   Ranch"   complained   that   a PopSockets product she purchased on Amazon [d]id not stick to my case at all!!!"  She explained that "[m]y old pop socket lasted for years… this didn't even stay on for 10 minutes!!!"



146.    On October 4, 2019, Amazon user "Ellison Greenslade" complained that she received a PopSockets product that was "entirely different" from the design she had purchased.



147.    On September 17, 2019, Amazon user "Sarah beck" complained that a PopSockets product she purchased on Amazon "[h]ad no stick left to it" when it arrived.



148.   The foregoing reviews are only a small sample of the negative reviews of PopSockets products that have been posted on the Amazon platform since PopSockets implemented its quality-control program.

149.   Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the PopSockets Trademarks on Amazon and are not subject to PopSockets' quality controls, however, it is likely that some of the foregoing negative reviews were written by customers who purchased products bearing the PopSockets Trademarks from Defendants.

### Defendants Are Not Authorized Sellers and are Illegally Selling Products Bearing the PopSockets Trademarks

150.   In the course of monitoring online listings of PopSockets products, PopSockets discovered a high volume of products bearing the PopSockets Trademarks being sold by Defendants on Amazon through a storefront called "The Savings Center."  No contact information was provided for the Amazon storefront "The Savings Center."

151.   Through investigation, PopSockets identified YEF Trading and Friedman as being responsible, at least in part, for the operation of "The Savings Center."  Neither YEF Trading nor Friedman are Authorized Sellers of PopSockets products.

152.     Because YEF Trading and Friedman are not Authorized Sellers, they are not subject to, and do not comply with, PopSockets' Authorized Seller requirements or the PopSockets Rules, including the additional quality-control requirements that PopSockets imposes on its Authorized Sellers who sell on Permissible Public Websites and on Amazon.

153.     Defendants have not applied to be Authorized Sellers of PopSockets products, and PopSockets has not approved Defendants to be Authorized Sellers of its products.

154.     Moreover, upon information and belief, Defendants could not be approved as Authorized Sellers because they do not comply with PopSockets' quality-control requirements, including the additional requirements it imposes on its Authorized Sellers who sell on Amazon. Defendants also do not comply with PopSockets' requirements because they do not list their full legal name, mailing address, telephone number, email address, or business name on their Amazon storefront.

155.     Despite not being approved as Authorized Sellers and not meeting the requirements in the PopSockets Rules regarding quality controls, Defendants have sold, and continue to sell, products bearing the PopSockets Trademarks through their Amazon storefront.

**Defendants Are Selling Poor Quality Products Through Their Amazon Storefront**

156.     Defendants have sold products through their Amazon storefront that are of poor quality, improperly packaged, and missing components.  Evidence of these sales can be seen by viewing reviews that customers have written of Defendants' Amazon storefront "The Savings Center."

157.     For example, on September 29, 2019, an Amazon user "Masydog" complained that a PopSockets product she purchased from Defendants' Amazon storefront "won't stay on my

phone.  She explained that "I've used popsockets for years.  This is the first one that hasn't held up."

158.    On October 4, 2019, Amazon user "Ward" complained that a PopSockets product he purchased from Defednants was packaged in a "heavy duty plastic cover" that he "ruined" while "trying to get it open," which required him to order a second product.

159.    On September 11, 2019, Amazon user "Brittaney" complained that a product she purchased from Defendants "[k]eeps falling off the car vent."

160.    On July 19, 2019, Amazon user "Rudi" complained that, after purchasing a product from Defendants' Amazon storefront, he received a "[b]ubble mailer" that had "nothing in it."

161.    On November 14, 2018, Amazon user "Teaque" complained that, after purchasing g product from Defendants' Amazon storefront, he received an "envelope with an empty baggie in it."

162.    These complaints about Defendants are typical of the complaints made about the products sold and customer service provided by unauthorized sellers, particularly unauthorized sellers who sell anonymously on Amazon.  PopSockets allows its products to be sold only by Authorized Sellers, who are subject to and must follow the quality-control and customer-service requirements in the PopSockets Rules, to prevent customers who purchase PopSockets products from suffering experiences like those described in the above complaints about Defendants.

**Defendants Do Not Abide by, and Interfere With, PopSockets' Quality-Control and Customer-Service Requirements**

163.     Defendants do not abide by PopSockets' quality-control and customer-service requirements that PopSockets requires Authorized Sellers to follow.

164.     Defendants do not comply with PopSockets' quality-control requirements because they have neither given PopSockets their business information nor given PopSockets an opportunity to vet them to determine if they meet PopSockets' high standards for Authorized Sellers that it approves to sell on Amazon.

165.     Defendants do not comply with PopSockets' quality-control requirements because they sell anonymously and provide no contact information on their Amazon storefront. Defendants' storefront page does not include their business name, mailing address, email address, or any other identifying information.

166.     Defendants do not comply with PopSockets' quality-control requirements because they sell on Amazon without PopSockets' authorization or oversight.

167.     Defendants also do not comply with PopSockets' quality-control requirements— and interfere with PopSockets' quality controls—because they have not disclosed to PopSockets where they acquire their products that bear the PopSockets Trademarks and have not given PopSockets the right to audit and inspect their facilities and records.  As a result, PopSockets cannot determine if any products Defendants are selling or have sold are subject to a recall or consumer-safety information effort, and it also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

168.    Customer reviews of Defendants' Amazon storefronts show that Defendants have sold products—including PopSockets products—that are of poor quality, improperly repackaged, and missing components.  *See, e.g., supra* ¶¶ 157-161.  Accordingly, upon information and belief, Defendants are not carrying out the quality-control inspection and packaging requirements that PopSockets requires Authorized Sellers to follow and are tampering with products and not removing damaged, defective, or otherwise poor-quality products bearing the PopSockets Trademarks from their inventory.  Instead, Defendants are selling products bearing the PopSockets Trademarks that are tampered with and of poor quality.  These sales cause customers to write highly negative reviews of PopSockets products in which they complain of receiving poor quality products, which harm PopSockets' reputation and hurt the placement of PopSockets products in search results.

169.    Defendants also do not comply with PopSockets' quality-control requirements because they store some of their products at Amazon fulfillment centers but, upon information and belief, have not opted out of Amazon's "Repackaging" service.  This means that Defendants are allowing products that are returned to Amazon to be repackaged and placed back in their inventory of products as "new' products.  This practice results in consumers, who believe they are purchasing new PopSockets products, actually receiving returned products that may have been previously used and/or tampered with.  As set forth above, numerous customers have complained that unidentified sellers on Amazon sold them PopSockets products that were previously used or had been tampered with.  *See, e.g.*, *supra* ¶¶ 123-127, 133, 135, 143-144, 147.

170.    Defendants' do not comply with PopSockets' quality-control requirements with respect to storage conditions because they store some of their products at Amazon fulfillment

centers and, upon information and belief, allow their inventory to be commingled with other sellers' inventory.  Accordingly, consumers may sometimes receive products that were sold and owned by *other* sellers when they purport to purchase products from Defendants' Amazon storefront, including products that may be defective, damaged, previously used, or counterfeit.  As a result, even if Defendants were to implement quality-assurance procedures comparable to those that PopSockets requires of its Authorized Sellers who are approved to sell on Amazon, Defendants would have no way to ensure that their products are those actually being shipped to customers in fulfillment of their orders.

171.   Defendants' failure to abide by the PopSockets Rules prevents PopSockets from exercising control over the quality of products Defendants sell bearing the PopSockets Trademarks.  PopSockets cannot audit Defendants to ensure they are complying with PopSockets' quality controls or close Defendants' account for failing to comply with PopSockets' quality-control requirements.

172.   Defendants' failure to comply with the PopSockets Rules also interferes with PopSockets' quality controls because, unlike with its Authorized Sellers who are approved to sell on Amazon that PopSockets is able to monitor through test purchases and other auditing actions, PopSockets cannot take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

173.   Because Defendants have not agreed to comply with PopSockets' quality-control requirements, including its audit procedures, PopSockets has no way to confirm that Defendants are qualified or trained to accurately describe, demonstrate, and sell the products bearing the PopSockets Trademarks in their inventory, or to advise customers on how to use PopSockets

products properly. Accordingly, Defendants may not provide the informed customer service regarding PopSockets products that PopSockets requires Authorized Sellers to provide.

174. Because Defendants have not agreed to comply with PopSockets' quality-control requirements, including its audit procedures, PopSockets has no way to confirm that Defendants provide the ongoing support, advice, and responses to customer inquiries that PopSockets requires its Authorized Sellers to provide to customers who purchased PopSockets products.

175. Because Defendants have not agreed to comply with PopSockets' quality-control requirements, including its audit procedures, PopSockets has no way to confirm that Defendants take appropriate steps to address negative reviews from customers. Defendants do not cooperate with PopSockets in investigating negative product reviews as Authorized Sellers are required to do.

**Defendants Are Infringing on the PopSockets Trademarks by Selling Products Bearing the PopSockets Trademarks that Are Not Subject To, Do Not Abide By, and Interfere with PopSockets' Quality-Control and Customer-Service Requirements**

176. For all of the reasons set forth above, the products Defendants sell bearing the PopSockets Trademarks fail to adhere to the extensive and legitimate quality controls that PopSockets exercises over products bearing the PopSockets Trademarks to protect consumers and its brand goodwill.

177. The products sold by Defendants bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements.

178.    Because the products Defendants sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, those products are materially different from genuine PopSockets products.

179.    Because the products Defendants sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, those products are not genuine PopSockets products.

180.    Defendants' unauthorized sale of products bearing the PopSockets Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine PopSockets products, when, in fact, they are not.

181.    Defendants' unauthorized sale of products bearing the PopSockets Trademarks infringes on the PopSockets Trademarks and diminishes their value.

182.    Despite these facts, Defendants have sold, and continue to sell, products bearing the PopSockets Trademarks through their Amazon storefront without PopSockets' consent.

183.    Defendants, through their highly interactive Amazon storefront, sell infringing products bearing the PopSockets Trademarks to consumers located in Colorado through the regular course of business.

**Defendants Are Infringing the PopSockets Trademarks by Selling Products Bearing the PopSockets Trademarks that Do Not Come with the Warranty**

184.    As set forth above, genuine PopSockets products purchased from PopSockets and its Authorized Sellers that comply with PopSockets' quality controls come with the Warranty.

185.    Because Defendants are not Authorized Sellers of PopSockets products and do not comply with PopSockets' quality controls, the products they sell bearing the PopSockets Trademarks do not come with the Warranty.

186.     Because the products Defendants sell do not come with the Warranty, they are materially different from genuine PopSockets products.

187.     Defendants' unauthorized sale of products bearing the PopSockets Trademarks is likely to, and does, create customer confusion because customers who purchase products bearing the PopSockets Trademarks from Defendants believe they are purchasing genuine PopSockets products that come with the Warranty when, in fact, they are not.

**Defendants Are Engaging In False Advertising by Falsely Representing
That the Products They Sell Come with the Warranty**

188.     In addition to infringing on the PopSockets Trademarks, Defendants are also falsely advertising that the products they sell come with the Warranty.

189.     Defendants are selling products bearing the PopSockets Trademarks on Amazon product listings that state that products are covered by the Warranty.  For example, Defendants are listing the following product that specifically states that it comes with the Warranty, which can be seen     at:     https://www.amazon.com/PopSockets-Collapsible-Stand-Phones-Tablets/dp/ B01EFPKMH6/ref=sr_1_1?keywords=popsockets&m=A39V60W8ZT39LG&qid=1576513155 &s=merchant-items&sr=1-1.  A screenshot of this listing, showing Defendants' "The Savings Center" storefront as the seller and including the specific representation that the product comes with the Warranty, is set forth here:



**PopSockets: Collapsible Grip & Stand for Phones and Tablets - Black & Mount**

by PopSockets

★★★☆☆   353 ratings  |  35 answered questions

List Price: ~~$14.99~~
Price: **$13.69** FREE Shipping on orders over $25.00 shipped by Amazon or get **Fast, Free Shipping** with Amazon Prime & FREE Returns
You Save: **$1.30 (9%)**

**Arrives before Christmas.**

- Offers a secure grip so you can text with one hand, snap better photos, and stop phone drops
- Functions as a convenient stand so you can watch videos on the fly
- Allows for hands-free use with the PopSockets mount
- Available in a broad range of styles and materials
- Advanced reusable adhesive: repositionable, washable adhesive sticks to most cases, won't stick to silicone/highly textured cases. Packaging includes adhesive disc to apply directly to iPhone & other glass back phones

Compare with similar items

New (1) from $13.69 & FREE Shipping on orders over $25.00

$13.69

FREE Shipping ∨ on orders over $25.00 shipped by Amazon or get **Fast, Free Shipping** with Amazon Prime & FREE Returns ∨

Want it tomorrow, Dec. 17? Order within **7 hrs 41 mins** and choose **One-Day Shipping** at checkout. Details

**In Stock.**

Qty: 1 ∨

Add to Cart

Buy Now

Sold by The Savings Center and Fulfilled by Amazon.

## Product description

A PopSockets grip is more than a stylish phone accessory. It's an opposable thumb for your phone. phone up on an airplane tray table to watch a movie. When you're done, it collapses flat like your b

PopSockets grips are repositionable and stick to most devices and cases but may not stick to silicon mirror, refrigerator, air conditioning vent or wherever you snack on content.

And now, a little something for all you specification geeks: Diameter: 1.56 inches, Height: .9 inches

Covered by PopSockets' limited warranty. See warranty below for full details.

190.    In addition to the language in the product listings, Defendants are also representing that their products come with the Warranty because they have listed their products as "New." Pursuant to Amazon's policies, a "New" product listing comes with the "original manufacturer's warranty":

**New:**

Just like it sounds. A brand-new, unused, unopened item in its original packaging, with all original packaging materials included. Original protective wrapping, if any, is intact. ==Original manufacturer's warranty, if any, still applies,== with warranty details included in the listing comments.

https://sellercentral.amazon.com/gp/help/external/200339950?language=en_US&ref=efph_2003
39950_cont_521.

191.     As set forth above, the products Defendants sell do not come with the Warranty.
Thus, by representing to consumers that the products they sell are "New" and come with the
Warranty, Defendants are falsely advertising the products they are selling.

**PopSockets Has Attempted to Stop Defendants' Infringing Sale of Products
Bearing the PopSockets Trademarks, But Defendants Continue to
Willfully Infringe the PopSockets Trademarks**

192.     After PopSockets discovered products bearing the PopSockets Trademarks being
sold illegally on the Amazon storefront "The Savings Center," PopSockets conducted an
investigation to determine the operators of the storefront because "The Savings Center" did not
provide any contact information.

193.     Through investigation, PopSockets determined that YEF Trading and Friedman are
responsible, at least in part, for operation of "The Savings Center."  Upon information and belief,
additional individuals and/or entities may also assist in the operation of "The Savings Center."

194.     On September 13, 2019, counsel for PopSockets sent a cease-and-desist letter to
YEF Trading and Friedman by overnight mail demanding that Defendants immediately cease
selling products bearing the PopSockets Trademarks and disclose every person and entity that
provided Defendants with the products they had listed for sale.

195.     On September 18, 2019, Friedman left a voicemail with counsel for PopSockets in
which he acknowledged receipt of PopSockets' letter and his operation of "The Savings Center."
In the following weeks, PopSockets communicated with Friedman over email and phone calls.
Friedman ultimately refused to cease selling products bearing the PopSockets Trademarks.  As of

the time of filing, "The Savings Center" storefront continues to advertise and sell products bearing the PopSockets Trademarks.

196.    Defendants have sold a high volume of products bearing the PopSockets Trademarks through their Amazon storefront.  Monitoring software shows that, since July 2019, Defendants have sold in excess of $100,000 worth of products.

197.    As of the time of filing, Defendants' Amazon storefront is called "The Savings Center."  The "Merchant ID" number for Defendants' storefront is A39V60W8ZT39LG.  The storefront can be accessed at: https://www.amazon.com/sp?seller=A39V60W8ZT39LG.

198.    PopSockets' September 13 letter to Defendants provided notice that PopSockets is located in Colorado and is harmed in Colorado by Defendants' illegal sales of infringing products bearing the PopSockets Trademarks.

199.    Defendants' conduct is typical of unauthorized sellers who know that they are engaged in unlawful conduct but choose to ignore letters in hopes that the trademark owner will not take legal action to stop their sales.

200.    Defendants' disregard of communications from PopSockets and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants are Tortiously Interfering with PopSockets' Agreements with its Authorized Sellers**

201.    PopSockets sells PopSockets products only to Authorized Sellers and to end-user customers through its website.

202.    Defendants have sold a high volume of products bearing the PopSockets Trademarks through their Amazon storefront.

203.    Defendants are not Authorized Sellers, and PopSockets has not itself sold any PopSockets products to Defendants.

204.    Although PopSockets must take discovery in this action to learn how Defendants acquired the products bearing PopSockets Trademarks that they have resold, based on these facts it is likely that Defendants have obtained those products from one or more Authorized Sellers.

205.    Upon information and belief, Defendants have purchased products from PopSockets' Authorized Sellers for the purpose of reselling the products on the Internet without PopSockets' approval, with full knowledge that such behavior would unlawfully infringe upon the PopSockets Trademarks.

206.    PopSockets' agreements with its Authorized Sellers prohibit Authorized Sellers from selling PopSockets products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

207.    Defendants were informed of this prohibition on or around September 14, 2019. On that date, Friedman and YEF Trading received a cease-and-desist letter from PopSockets. PopSockets' letters informed Defendants that the contracts between PopSockets and its Authorized Sellers prohibit Authorized Sellers from selling PopSockets products to any person or entity that is not an Authorized Seller and intends to resell the products.

208.    PopSockets' letters also informed Defendants that, by purchasing PopSockets products from an Authorized Seller for purposes of resale, they were causing a breach of the agreement between PopSockets and its Authorized Seller and were interfering with PopSockets' agreements and business relationships.

209.    PopSockets' letters also informed Defendants that if they continued to acquire products from PopSockets' Authorized Sellers for the purpose of reselling them, they would be liable for tortiously interfering with PopSockets' contracts and/or business relationships.

210.    Despite being provided this information, upon information and belief, Defendants have continued to acquire products from PopSockets' Authorized Sellers with the intent to resell them.

211.    Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with PopSockets so they can acquire products bearing the PopSockets Trademarks and unlawfully infringe upon the PopSockets Trademarks by reselling the products.

**PopSockets Has Suffered Significant Harm as a Result of Defendants' Conduct**

212.    As set forth above, the unauthorized sale of products bearing the PopSockets Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the POPSOCKETS brand.

213.    When a consumer receives from Defendants a non-genuine, poor-quality, or defective product and/or a product that does not come with the Warranty, the consumer associates that negative experience with PopSockets.  The consumer may also leave a negative review on a PopSockets product page.  As such, Defendants' ongoing sale of unauthorized products bearing the PopSockets Trademarks harms the POPSOCKETS brand.

214.    PopSockets has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions, including, but not limited to, loss of sales, damage to PopSockets' intellectual property, and damage to its existing and potential business relations.

215.    PopSockets has suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

216.    PopSockets is entitled to injunctive relief because, upon information and belief, Defendants will otherwise continue to sell products bearing the PopSockets Trademarks unlawfully and infringe the PopSockets Trademarks, causing continued irreparable harm to PopSockets' reputation, goodwill, relationships, intellectual property, and brand integrity.

217.    Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

218.    Defendants' willful infringement of the PopSockets Trademarks and continued pattern of misconduct demonstrate an intent to harm PopSockets.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

219.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

220.    PopSockets owns the PopSockets Trademarks.

221.    PopSockets has registered the PopSockets Trademarks with the United States Patent and Trademark Office.

222.    The PopSockets Trademarks are valid and subsisting trademarks in full force and effect.

223.    Defendants willfully and knowingly used, and continue to use, the PopSockets Trademarks in interstate commerce for the purpose of selling products bearing the PopSockets Trademarks without PopSockets' consent.

224.    The products Defendants sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

225.    The products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty.

226.    PopSockets has established legitimate and substantial quality-control procedures with which genuine PopSockets products must comply.

227.    PopSockets abides by these quality-control procedures and requires all of its Authorized Sellers to abide by these quality controls.

228.    PopSockets' quality controls are material, as they protect consumers and prevent consumers from receiving poor-quality products.  When a consumer considers whether to purchase a product bearing the PopSockets Trademarks, the applicability of PopSockets' quality controls to the product is relevant to the consumers' purchasing decision.

229.    The products Defendants sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements.

230.    Because the products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty, are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants sell are materially different from genuine PopSockets products sold by Authorized Sellers.

231.    Because the products Defendants sell bearing the PopSockets Trademarks are materially different from PopSockets products sold by Authorized Sellers, the products Defendants sell are not genuine PopSockets products.

232.    Defendants' unauthorized sales of products bearing the PopSockets Trademarks interfere with PopSockets' quality controls and its ability to exercise quality control over products bearing the PopSockets Trademarks.

233.    Defendants' unauthorized sales of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, PopSockets' quality controls when, in fact, they do not.

234.    Defendants' unauthorized sales of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are genuine PopSockets products when, in fact, they are not.

235.    Defendants' unauthorized sales of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are sponsored or authorized by PopSockets when, in fact, they are not.

236.    Defendants' unauthorized use of the PopSockets Trademarks has infringed and materially damaged the value of the PopSockets Trademarks and caused significant damage to PopSockets' business relationships.

237.    As a proximate result of Defendants' actions, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  PopSockets has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming PopSockets' reputation among consumers and the placement of its products in search results.

238.    PopSockets is entitled to recover its damages caused by Defendants' infringement of the PopSockets Trademarks and disgorge Defendants' profits from Defendants' willfully infringing sales and unjust enrichment.

239.    PopSockets is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, PopSockets will suffer irreparable harm.

240.    PopSockets is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed the PopSockets Trademarks.

### SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

241.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

242.    PopSockets is the owner of the PopSockets Trademarks.

243.    Defendants have willfully and knowingly used, and continue to use, the PopSockets Trademarks in interstate commerce for purposes of selling products bearing the PopSockets Trademarks without PopSockets' consent.

244.    The products Defendants advertise and sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

245.    PopSockets has established and implemented legitimate and substantial quality controls with which genuine PopSockets products must comply.

246.    PopSockets abides by these quality controls and requires all of its Authorized Sellers to abide by these quality controls.

247.    PopSockets' quality controls are material, as they protect consumers and prevent them from receiving poor-quality, damaged, and defective products.

248.    The products Defendants advertise and sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements.

249.    Because the products Defendants advertise and sell bearing the PopSockets Trademarks do not come with the Warranty, and are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants sell are materially different from genuine PopSockets products.

250.    Because the products Defendants advertise and sell bearing the PopSockets Trademarks do not come with the Warranty, and are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants advertise and sell are not genuine PopSockets products.

251.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks interferes with PopSockets' quality controls and its ability to exercise quality control over products bearing the PopSockets Trademarks.

252.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer are covered by the Warranty and are subject to and abide by PopSockets' quality controls when, in fact, they are not.

253.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are genuine PopSockets products when, in fact, they are not.

254.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are sponsored by, authorized by, or otherwise connected with PopSockets when, in fact, they are not.

255.    Defendants' unauthorized use of the PopSockets Trademarks has infringed upon and materially damaged the value of the PopSockets Trademarks and caused significant damage to PopSockets' business relationships.

256.    As a result of Defendants' conduct, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will

remain on Amazon permanently, harming PopSockets' reputation among consumers and placement in search results.

257.    PopSockets has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

258.    PopSockets is entitled to recover its damages caused by Defendants' infringement of the PopSockets Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

259.    PopSockets is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, PopSockets will suffer irreparable harm.

260.    PopSockets is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the PopSockets Trademarks.

### THIRD CAUSE OF ACTION
**False Advertising**
**15 U.S.C. § 1125(a)(1)(B)**

261.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

262.    PopSockets is the owner of the PopSockets Trademarks.

263.    The PopSockets Trademarks are valid and subsisting trademarks in full force and effect.

264.    Through their Amazon storefront, Defendants have willfully and knowingly used, and continue to use, the PopSockets Trademarks in interstate commerce for purposes of

advertising, promoting, and selling products bearing the PopSockets Trademarks without PopSockets' consent.

265.    Defendants' advertisements and promotions of their products unlawfully using the PopSockets Trademarks have been disseminated to the relevant purchasing public.

266.    PopSockets products purchased from PopSockets and its Authorized Sellers, who comply with PopSockets' quality controls, come with the Warranty.

267.    PopSockets cannot oversee or take action to correct the quality of its products sold by unauthorized sellers.  As a result, PopSockets does not extend its Warranty to products that are sold by unauthorized sellers who are outside of and do not comply with PopSockets' quality controls.  Accordingly, the products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty.

268.    Defendants falsely advertise that the products they sell bearing the PopSockets Trademarks come with the Warranty.  As discussed above, the product listings on which Defendants sell products bearing the PopSockets Trademarks specifically state that they come with the Warranty.  Defendants also advertise that the products they sell bearing the PopSockets Trademarks are "New" products, which under Amazon's policies means that they come with the Warranty.

269.    These representations are false because the products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty.

270.    Defendants' use of the PopSockets Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the PopSockets Trademarks misrepresents the

nature, characteristics, qualities, and origin of the products because it suggests that they come with the Warranty when, in fact, they do not.

271.    As a proximate result of Defendants' actions, PopSockets has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

272.    PopSockets is entitled to recover its damages caused by Defendants' infringement of the PopSockets Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

273.    PopSockets is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, PopSockets will suffer irreparable harm.

274.    PopSockets is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the PopSockets Trademarks.

**FOURTH CAUSE OF ACTION**
**Common Law Trademark Infringement**

275.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

276.    PopSockets owns the PopSockets Trademarks.

277.    The PopSockets Trademarks are valid and subsisting trademarks in full force and effect.

278.    The PopSockets Trademarks are distinctive and widely recognized by the consuming public.  PopSockets' products are sold and purchased through its website and its network of Authorized Sellers throughout the United States, including Colorado.

279.    PopSockets is widely recognized as the designated source of goods bearing the PopSockets Trademarks.

280.    Defendants willfully and knowingly used, and continue to use, the PopSockets Trademarks in commerce for purposes of selling products bearing the PopSockets Trademarks in Colorado without PopSockets' consent.

281.    The products Defendants sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

282.    The products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty.

283.    PopSockets has established legitimate and substantial quality-control procedures over PopSockets products.

284.    PopSockets abides by these quality-control procedures and requires all Authorized Sellers to abide by them as well.

285.    PopSockets' quality controls are material, as they protect consumers and prevent them from receiving poor-quality products that could harm them.  When a consumer considers whether to purchase a product bearing the PopSockets Trademarks, the applicability of PopSockets' quality controls to the product is relevant to the consumer's purchasing decision.

286.     The products Defendants sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements.

287.     Because the products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty, and are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants sell are materially different from genuine PopSockets products sold by Authorized Sellers.

288.     Because the products Defendants sell bearing the PopSockets Trademarks are materially different from PopSockets products sold by Authorized Sellers, the products Defendants sell are not genuine PopSockets products.

289.     Defendants' unauthorized sale of products bearing the PopSockets Trademarks interferes with PopSockets' quality controls and its ability to exercise quality control over products bearing the PopSockets Trademarks.

290.     Defendants' unauthorized sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, PopSockets' quality controls when, in fact, they are not subject to them.

291.     Defendants' unauthorized sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are genuine PopSockets products when, in fact, they are not.

292.    Defendants' unauthorized sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with PopSockets when, in fact, they are not.

293.    Defendants' knowing and willful use of the PopSockets Trademarks in connection with the unauthorized and illegal sale of products bearing the PopSockets Trademarks without PopSockets' consent infringes the PopSockets Trademarks and is contrary to honest practice in industrial and commercial matters.

294.    Defendants' unauthorized use of the PopSockets Trademarks has infringed upon and materially damaged the value of the PopSockets Trademarks, caused significant damage to PopSockets' business relations, and infringed the PopSockets Trademarks.

295.    As a result of Defendants' conduct, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming PopSockets' reputation among consumers and placement in search results.

296.    PopSockets has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

297.    PopSockets is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**FIFTH CAUSE OF ACTION**
**Common Law Unfair Competition**

298.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

299.    PopSockets owns the PopSockets Trademarks.

300.    The PopSockets Trademarks are valid and subsisting trademarks in full force and effect.

301.    The PopSockets Trademarks are distinctive and widely recognized by the consuming public.  PopSockets' products are sold and purchased through its website and its network of Authorized Sellers throughout the United States, including Colorado.

302.    PopSockets is widely recognized as the designated source of goods bearing the PopSockets Trademarks.

303.    Defendants willfully and knowingly used, and continue to use, the PopSockets Trademarks in commerce for purposes of selling products bearing the PopSockets Trademarks in Colorado without PopSockets' consent.

304.    The products Defendants advertise and sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

305.    The products Defendants sell bearing the PopSockets Trademarks do not come with the Warranty.

306.    PopSockets has established legitimate and substantial quality-control procedures over PopSockets products.

307.    PopSockets abides by these quality-control procedures and requires all of its Authorized Sellers to abide by them as well.

308. PopSockets' quality controls are legitimate and material, as they protect consumers and prevent them from receiving poor-quality products that could harm them. When a consumer considers whether to purchase a product bearing the PopSockets Trademarks, the applicability of PopSockets' quality controls to the product is relevant to the consumer's purchasing decision.

309. The products Defendants advertise and sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer service requirements.

310. Because the products Defendants advertise and sell bearing the PopSockets Trademarks do not come with the Warranty, and are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants sell are materially different from genuine PopSockets products sold by Authorized Sellers.

311. Because the products Defendants advertise and sell bearing the PopSockets Trademarks are materially different from PopSockets products sold by Authorized Sellers, the products Defendants sell are not genuine PopSockets products.

312. Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks interferes with PopSockets' quality controls and its ability to exercise quality control over products bearing the PopSockets Trademarks.

313. Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, PopSockets' quality controls when, in fact, they are not.

314.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are genuine PopSockets products when, in fact, they are not.

315.    Defendants' unauthorized advertisement and sale of products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with PopSockets when, in fact, they are not.

316.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine PopSockets products when, in fact, they are not.

317.    Defendants' unauthorized sale of products bearing the PopSockets Trademarks and unauthorized use of the PopSockets Trademarks in advertising infringes the PopSockets Trademarks.

318.    Defendants' unauthorized use of the PopSockets Trademarks has materially damaged the value of the PopSockets Trademarks, caused significant damage to PopSockets' business relations, and infringed the PopSockets Trademarks.

319.    As a result, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  PopSockets has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

320.    PopSockets is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**SIXTH CAUSE OF ACTION**
**Deceptive Trade Practices**
**C.R.S. § 6-1-105**

321.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

322.    PopSockets owns the PopSockets Trademarks.

323.    The PopSockets Trademarks are valid and subsisting trademarks in full force and effect.

324.    Defendants willfully and knowingly used, and continue to use, the PopSockets Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising, promoting, and selling products bearing the PopSockets Trademarks without the consent of PopSockets.

325.    Defendants' advertisements and promotions of products unlawfully using the PopSockets Trademarks have been disseminated to the relevant purchasing public.

326.    Defendants use the PopSockets Trademarks with the intent that consumers will rely on Defendants' use of the PopSockets Trademarks and believe that Defendants are selling genuine PopSockets products.

327.    The products Defendants advertise, promote, and sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

328.     The products Defendants advertise, promote, and sell bearing the PopSockets Trademarks do not come with the Warranty.

329.     PopSockets has established substantial quality-control procedures that genuine PopSockets products must comply with.

330.     PopSockets abides by these quality-control procedures and requires all Authorized Sellers to abide by them as well.

331.     PopSockets' quality controls are legitimate and material, as they protect consumers and prevent them from receiving poor-quality products that could harm them.  When a consumer considers whether to purchase a product bearing the PopSockets Trademarks, the applicability of PopSockets' quality controls to the product is relevant to the consumers' purchasing decision.

332.     The products Defendants advertise, promote, and sell bearing the PopSockets Trademarks are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements.

333.     Because the products Defendants advertise, promote, and sell bearing the PopSockets Trademarks do not come with the Warranty, and are not subject to, do not abide by, and interfere with PopSockets' quality controls and customer-service requirements, the products Defendants sell are materially different from genuine PopSockets products sold by Authorized Sellers.

334.     Because the products Defendants advertise, promote, and sell bearing the PopSockets Trademarks are materially different from PopSockets products sold by Authorized Sellers, the products Defendants sell are not genuine PopSockets products.

335.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the PopSockets Trademarks interfere with PopSockets' quality controls and ability to exercise quality control over products bearing the PopSockets Trademarks.

336.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, PopSockets' quality controls when, in fact, they do not.

337.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are genuine PopSockets products when, in fact, they are not.

338.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the PopSockets Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with PopSockets when, in fact, they are not.

339.    Defendants' unauthorized and deceptive use of the PopSockets Trademarks is material and likely to influence customers to purchase the products Defendants sell, as consumers are likely to believe that products Defendants advertise using the PopSockets Trademarks are genuine PopSockets products that are subject to, and abide by, PopSockets' quality-control requirements and come with benefits associated with authentic PopSockets products when, in fact, they do not.

73

340.    Defendants' unauthorized use of the PopSockets Trademarks in advertising, and otherwise, infringes the PopSockets Trademarks.

341.    Defendants' use of the PopSockets Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the PopSockets Trademarks is a deceptive trade practice under C.R.S. § 6-1-105.

342.    As a result of Defendants' conduct, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming PopSockets' reputation among consumers and placement in search results.

343.    PopSockets has also suffered, and continues to suffer, damages, including but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

344.    Pursuant to C.R.S. § 6-1-113, PopSockets is entitled to an injunction enjoining Defendants' unlawful conduct, and an award of treble damages and attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
**Tortious Interference with Existing and/or Prospective Contracts and Business Relations**

345.    PopSockets re-alleges and incorporates the allegations set forth in the foregoing paragraphs.

346.    PopSockets products are sold exclusively through PopSockets' website and its network of Authorized Sellers

347.    PopSockets has entered into agreements with its Authorized Sellers to sell PopSockets products.  These agreements specifically prohibit Authorized Sellers from selling PopSockets products to unauthorized resellers, such as Defendants.

348.   Defendants are not Authorized Sellers of PopSockets products.

349.   Defendants have sold—and continue to sell—a high volume of products bearing the PopSockets Trademarks through their Amazon storefront "The Savings Center."

350.   PopSockets has not itself sold any PopSockets products to Defendants.

351.   Based on these facts, it is plausible and a reasonable inference that Defendants have purchased the products they are selling, and have resold, from one or more of PopSockets' Authorized Sellers.

352.   Defendants know that PopSockets' agreements with its Authorized Sellers prohibit Authorized Sellers from selling PopSockets products to anyone who, such as Defendants, is not an Authorized Seller and intends to resell the products.

353.   Defendants had notice of this prohibition at the latest on or around September 14, 2019, through a cease-and-desist letter they received from PopSockets.

354.   Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with PopSockets' agreements with its Authorized Sellers by inducing the Authorized Sellers to breach their agreements and sell products to Defendants so they could unlawfully resell them on the Internet.

355.   After being notified of this prohibition, Defendants intentionally induced one or more of PopSockets' Authorized Sellers to breach their agreements with PopSockets by continuing to acquire products from PopSockets' Authorized Sellers for the purpose of selling them on the Internet.

356.   Defendants acted with a wrongful purpose and employed wrongful means by acquiring PopSockets products for the purpose of reselling those products on the Internet in

violation of PopSockets' agreements with its Authorized Sellers. Specifically, Defendants induced Authorized Sellers to breach their agreements with PopSockets so that Defendants could unlawfully infringe upon and materially damage the value of the PopSockets Trademarks by reselling the products they obtained from Authorized Sellers on the Internet.

357.    Because Defendants have refused to disclose how they have obtained the products bearing the PopSockets Trademarks they have resold, PopSockets must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants. Defendants, however, know the sources of the PopSockets products they have obtained and the basis for PopSockets' claim of tortious interference. PopSockets' agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

358.    Defendants' actions have caused injury to PopSockets for which PopSockets is entitled to compensatory damages in an amount to be proven at trial.

359.    The injury to PopSockets is immediate and irreparable, as PopSockets' reputation and relationships have been damaged among both its consumers and Authorized Sellers.

360.    PopSockets is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## PRAYER FOR RELIEF

WHEREFORE, PopSockets prays for relief and judgment as follows:

A.    Judgment in favor of PopSockets and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble

damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

    B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

    i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all PopSockets products;

    ii)    Prohibiting the Enjoined Parties from using any of the PopSockets Trademarks in any manner, including advertising on the Internet;

    iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all PopSockets products as well as any products bearing any of the PopSockets Trademarks;

    iv)    Prohibiting the Enjoined Parties from purchasing any PopSockets products or any products bearing any PopSockets Trademarks for purposes of resale from any PopSockets Authorized Sellers in violation of the contracts between PopSockets and those Authorized Sellers, or otherwise inducing PopSockets' Authorized Sellers to breach their contracts with PopSockets;

    v)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the PopSockets Trademarks,

77

including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

vi)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of the PopSockets products, or any of the PopSockets Trademarks;

vii)    Requiring the Enjoined Parties to take all action, including but not limited to requesting removal from Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the PopSockets Trademarks which associate the PopSockets products or the PopSockets Trademarks with the Enjoined Parties or the Enjoined Parties' websites or storefronts;

viii)   Requiring the Enjoined Parties to take all action to remove unauthorized PopSockets Trademarks from the Internet, including from www.amazon.com;

C.      An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

PopSockets demands a trial by jury on all claims and issues so triable.

Dated this 21st day of December, 2019.

Respectfully submitted,

*/s/ Matthew Groves*
Groves Law, LLC
281 S. Pearl St.
Denver, CO 80209
Phone:  (303) 557-0199
Email:  matt@grovesllc.com

William D. Kloss (Ohio Bar No. 0040854)
Daren S. Garcia (Ohio Bar No. 007156)
Rajeev K. Adlakha (Ohio Bar No. 0087096)
Vorys, Sater, Seymour and Pease LLP
200 Public Square
Suite 1400
Cleveland, OH 44114-2327
Phone:  (216) 479-6175
Email:  wdklossjr@vorys.com
        dsgarcia@vorys.com
        rkadlakha@vorys.com

*Counsel for Plaintiff PopSockets LLC*

Plaintiff's Address:
5757 Central Ave.
Boulder, CO 80301